UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re                                  :    Chapter 7

JENNIFER ST. HILL                      :

      Debtor                       :    Bankruptcy No. 04-30919F

............................................

MEMORANDUM

............................................

Before me is the motion of debtor, Jennifer St. Hill, Esquire, seeking to voluntarily dismiss her chapter 7 bankruptcy case pursuant to 11 U.S.C. § 707(a). Her motion is opposed by the chapter 7 trustee, Marvin Krasny, Esquire, as well as National Penn Bank ("NPB").[1] NPB holds a first mortgage lien on the real property at 217 West Indian Creek Road in Wynnewood, Pennsylvania which the debtor and her husband, Tommie St. Hill, own and in which they reside. The debtor's motion to dismiss is supported by her husband and by the PIDC Local Development Corp. ("PIDC"), which is the largest unsecured creditor in the case, allegedly owed more than $3 million. Another

---

[1] The debtor's motion is also opposed by Mr. Daniel C. Polhill, an individual who filed an unsecured claim in this bankruptcy case in the amount of $10,436.80. Although no objection has been filed to Mr. Polhill's claim, at the hearing held on her motion to dismiss the debtor took the position that he was not one of her creditors, arguing instead that he had entered into a service contract with an entity known as St. Hill & Associates. If Mr. Polhill is not a creditor of the debtor, he may not have standing to oppose dismissal. Mr. Polhill counters that his agreement was with the debtor individually, and not with any corporate entity.
      Despite the heated contentions of the parties regarding this issue, I decline to determine at this point whether Mr. Polhill is indeed a creditor of the debtor, as the outcome would not affect my determination of the instant motion to dismiss. Thus, if I deny dismissal, the chapter 7 trustee—who typically is the only person with the power to object to proofs of claims, see, e.g., In re Toms, 229 B.R. 646, 650 (Bankr. E.D. Pa. 1999)—can decide whether to challenge the claim. And if I grant dismissal, the parties can resolve this state law dispute in the appropriate state court forum.

unsecured creditor present at the hearing on the motion, Hudson United Bank, took a neutral position regarding dismissal.

This contested matter concerning dismissal appears to be a by-product of another dispute between the debtor and trustee previously decided: the chapter 7 trustee's successful challenge to the debtor's amended exemption claims (which decision is currently on appeal in the district court). Both disputes stem from the trustee's efforts to sell the debtor's residence based upon his belief that there is substantial equity in this property. In order to avoid this potential sale, the debtor unsuccessful sought to amend her exemptions. With her amended exemptions disallowed, she now proposes to dismiss her bankruptcy case.

An extensive evidentiary hearing was held in connection with the instant motion to dismiss, at which time both the debtor and the trustee offered expert opinions as to the value of the debtor's home. These opinions diverge dramatically, with one expert opining that the home has a value almost twice that of the other expert. As will be seen, however, in order to determine this motion, I need not fix a precise value upon the Wynnewood property.

I.

The following material facts were adduced at the hearing, or derived from the debtor's bankruptcy schedules, court orders and docket entries.

The debtor filed a voluntary bankruptcy petition under chapter 7 on August 11, 2004, and estimated on her petition that she had no non-exempt property available for

2

distribution to creditors. On September 7, 2004, she filed her bankruptcy schedules and statement of financial affairs as mandated by Fed. R. Bankr. P. 1007(b).

On Schedule A, the debtor disclosed ownership of the Wynnewood property and valued it at $542,000.00, with secured claims of $640,843.38. She listed this real property as jointly owned with her husband, and identified the lien claims against the property as joint debts. On Schedule C, the debtor elected the federal bankruptcy law exemptions found in 11 U.S.C. § 522(d).[2] Thereafter, she claimed that all of her property, including the Wynnewood real property, was exempt by virtue of 11 U.S.C. § 522(d)(1)-(d)(5).[3]

On Schedule D, the debtor listed three secured creditors as holding liens totaling $640,843.38 on the Wynnewood Property: NPB in the amount of $627,343.00; Lower Merion Township in the amount of $4,107.00; and Montgomery County Tax Claim Bureau in the amount of $9,393.38. On Schedule F, the debtor listed all her creditors holding unsecured claims. On that schedule, she identified 10 creditors that held claims jointly against herself and her husband. Among those creditors was PIDC, which was scheduled as holding two joint unsecured claims totaling $2,872,168.15.

---

[2] By virtue of section 522(b)(1), individual debtors can elect between the federal exemptions found in section 522(d) and state law exemptions, unless state law precludes an election of the federal exemptions. Pennsylvania has not opted out of the federal exemptions. See Kaplan v. First Options of Chicago, Inc., 189 B.R. 882, 888 n.6 (E.D. Pa. 1995). Accordingly, debtors in this district may choose between state and federal bankruptcy exemptions.

[3] The debtor actually scheduled the value of the claimed exemption of her real property as $0.00, possibly based upon her assertion that the liens against the realty exceeded its value.

3

The debtor thereafter filed a lengthy series of amendments to her bankruptcy schedules, which were detailed in a memorandum decision dated September 2, 2005, and which shall not be repeated. For purposes of this motion, it is relevant to note that as early as October 5, 2004, the trustee made clear his unwillingness to accept the debtor's valuation of the Wynnewood property, with the possible result that he would seek to sell the residence for the benefit of creditors. N.T., at 118-19; see also docket entries ## 18, 41. Toward that end, the trustee engaged the services of a real estate appraiser, a real estate broker, and an attorney. Docket entries ## 44, 52, 93, 104, 122, 125. Based upon the report of his appraiser that the realty was worth approximately $1.5 million (or about $1 million more than the debtor's valuation), the trustee gave notice to creditors that he believed there were non-exempt assets that could be liquidated and a dividend paid to unsecured creditors. Docket entry # 131. The trustee also obtained a court order directing the debtor to afford the trustee's broker and prospective purchasers access to the realty. Docket entry # 153.

        I mentioned earlier that the trustee successfully litigated in this court his objections to the debtor's exemption claim in the Wynnewood realty. The trustee's first objection yielded an order dated February 2, 2005, wherein I limited the debtor's real property exemption under section 522(d)(1) to an amount not to exceed $18,450. The second objection resulted in an order dated September 2, 2005, which disallowed the debtor's attempt to amend her exemption from 11 U.S.C. § 522(d)(1) to § 522(b)(2)(B). (It is the latter order that is presently on appeal.) The trustee has also commenced an adversary proceeding against Mr. St. Hill, pursuant to 11 U.S.C. § 363(h), seeking authorization to sell the Wynnewood property free and clear of the interest of the non-

4

debtor spouse, as well as the debtor. (Trial on that issue is presently scheduled for February 2006.)

At the hearing held on the debtor's instant motion to voluntarily dismiss her bankruptcy case, a representative of NPB testified that this lender holds a mortgage lien on the Wynnewood realty, with the outstanding balance (including the cost of "forced-place insurance"[4]) totaling roughly $680,000. N.T., at 108. In addition to this total, NPB has also incurred legal fees of approximately $3,100. Id. The current monthly payment on the mortgage, which does not include the cost of forced-place insurance, is roughly $4,600. Id., at 109. PNB's representative also testified that the debtor's last mortgage payment was "made in September of 2004." Id., at 190.

Because the debtor ceased tendering mortgage payments, NPB filed a motion on December 15, 2004 seeking to terminate the bankruptcy stay. Docket entry # 51. On February 11, 2005, NPB withdrew its motion. Docket entry # 91. NPB offered the following explanation for withdrawing its lift-stay motion:

> We withdrew that motion in February 2004 [sic], and our withdrawal was based on the reliance of the trustee's plan to sell the property and the bank would have been paid off with the proceeds from that sale.

Id., at 191.

As mentioned above, the debtor's Schedule D identifies liens on the Wynnewood property as being held by the Lower Merion Township as well as the Montgomery Tax Claim Bureau. Those creditors were estimated to be owed

---

[4] The "forced place insurance" was obtained by the bank when the homeowner's policy on the property expired and debtor and her husband failed to renew or replace it. N.T., at 46, 111, 192-93. The bank was "forced" to obtain insurance on the property to protect its interest. Id., at 111.

5

approximately $13,500. See also N.T., at 27 (debtor testified that tax liens on the property totaled $14,000 and, at the end of the year, another $14,000 would be due). When these tax liens are added to NPB's mortgage lien (including attorney's fees), total liens on the Wynnewood property aggregate to roughly $696,600.

The trustee estimated that, as of the hearing date, his counsel fees were approximately $70,000. N.T., at 140.[5] He explained that his commission, which will be in addition to his counsel fees, will be limited by the maximum amounts identified in section 326(a) of the Bankruptcy Code. Id.

Finally, much of the evidence at the hearing was devoted to the value of the Wynnewood property, which consists of a residence with 20 rooms (including 6 bedrooms and 5.5 bathrooms), has more than 7,400 square feet of interior space,[6] and is situated upon a one-acre lot. The debtor and her husband testified that they purchased the residence in 1997 for $531,000, N.T., at 11-12, 29, and that at present it was in poor condition. N.T., at 17-22.

The debtor's expert appraiser, Ms. Francine S. Cross, opined that the property was in average condition and worth, as of October 18, 2005, approximately $850,000. Ex. D-2. The trustee's expert appraiser, Mr. Bruce Lazar, considered the realty to be in "average-good condition" and worth, as of February 15, 2005, about $1.5 million. Ex. A. He believed the property would have appreciated in value since February

---

[5]While the transcript refers to fees of "$7,000," my bench notes reflect that the trustee testified that his attorney's fees to date were approximately "$70,000." The debtor's Post-hearing Memorandum, at 4, also refers to the trustee's $70,000 estimate. Therefore, I conclude that the notes of testimony contain an inadvertent error on this point.

[6]The debtor's appraiser calculated the "gross living area" at 7,434 square feet, Ex. D-2, while the trustee's appraiser calculated the "gross living area" at 7,829 square feet. Ex. A.

2005. N.T., at 161 and suggested that it could now be worth as much as $1.8 million. N.T., at 171. Neither appraisal report identifies the residence as being in need of particular repair or attention.

Both appraisals state that the property sits on a level lot, has 3-zone air conditioning, four fireplaces, a slate patio, a roof deck and a two-car garage. Exhibit D-2; Exhibit A. The drainage and landscaping of the property are listed identically in both reports as "appears adequate" and "average," respectively. Exhibit D-2; Exhibit A. The trustee's appraisal lists the "special features" of the home as: "600 amp electrical service, 75 gallon gas domestic and h/w heater, modern baths, modern kitchen with wood cabinets, sub zero ref., prof cooktop, trash comp. and h/w flooring." Ex. A. The debtor's appraisal does not mention these items; instead it refers to "aluminum siding, aluminum windows, insulation." Ex. D-2.

The two appraisal reports arrive at completely different values largely because the experts differ in three respects when applying the comparable sales approach to valuation.

First, the appraisers differ markedly in their opinions concerning the value of the land upon which the residence sits. The trustee's appraiser valued the land at $600,000 in February 2005. Ex. A. The debtor's appraiser valued it at only $350,400. Ex. D-2.[7] This difference of opinion resurfaces in the experts' choices of comparable homes in applying the comparable sales approach to value. The trustee's appraiser considers homes most of whom have lot sizes of almost one acre. The debtor's appraiser

---

[7] The land values can be obtained from the appraisal reports by examining the cost approach to value on page 2. The value of the land is obtained by subtracting the "depreciated value of improvements" and the "as-is value of site improvements" from the total cost valuation.

7

considers homes as comparable when their lot sizes are much smaller (one as little as 20% of the debtor's lot), since she places considerably less importance upon this attribute.

Second, the debtor's appraiser believes that the large size of the debtor's home reduces its market value when compared with somewhat smaller homes in Wynnewood. The trustee's appraiser disagrees.

Their difference on this point is well emphasized by their respective comparisons of the debtor's property, located at 217 Indian Creek Road, with a neighboring property located at 206 Indian Creek Road. This neighboring property sold recently for $1,095,000. Its lot was roughly 0.4 acres (compared with the debtor's 1 acre lot) and its residence contained 4,978 square feet (compared with the debtor's more than 7,400 square feet) of living space. Thus, this neighboring property was considerably smaller than the debtor's. The debtor's appraiser opined that the smaller residence *enhanced* the value of the comparable property by $125,000. The trustee's appraiser viewed the reduced square footage as *diminishing* the value of the neighboring property, as compared with the debtor's, by $142,000. The trustee's appraiser also considered the reduced lot size as reducing the comparable value by $75,000, while the debtor's appraiser reduced the value by only $40,000.

The third significant difference concerned the selection of comparable properties. The debtor's appraiser applied her valuation methodology only to other properties located in Wynnewood, even if they were as far away as two miles from the debtor's home. The trustee's appraiser was willing to consider closer properties located in Merion Station, only one mile away from the subject residence, as comparable. As a result of their differing opinions as to comparable locations, the trustee's appraiser

8

compared the debtor's realty to two properties more proximate and which sold for higher prices than those considered by the debtor's appraiser, even though these two properties were outside of Wynnewood.

II.

A.

The statutory basis for the debtor's dismissal request stems from 11 U.S.C. § 707(a) which states:

> (a) The court may dismiss a case under this chapter only after notice and a hearing and only for cause including--
>
> > (1) unreasonable delay by the debtor that is prejudicial to creditors;

In chapter 7, unlike chapter 13 (see 11 U.S.C. § 1307(b)), a debtor has no absolute right to dismiss a bankruptcy case. See, e.g., In re Bartee, 317 B.R. 362, 366 (B.A.P. 9th Cir. 2004); In re Hopkins, 261 B.R. 822, 823 (Bankr. E.D. Pa. 2001); In re Mathis Ins. Agency, Inc., 50 B.R. 482, 486 (Bankr. E.D. Ark. 1985); In re Klein, 39 B.R. 530, 532 (Bankr. E.D.N.Y 1984). As one bankruptcy court observed:

> Chapter 7 bankruptcy is not something that you can dip your toe into in order to check the temperature of the water. It is something you jump into and you can only be rescued from it if you can show cause.

In re Dreamstreet, Inc., 221 B.R. 724, 725-26 (Bankr. W.D. Tex. 1998).

The debtor, as the movant under § 707(a), has the burden of demonstrating "cause" for dismissal. See In re Simmons, 200 F.3d 738, 743 (11th Cir. 2000). In other

9

words, while it is generally accepted that the debtor is a party in interest who may seek dismissal, see In re Hopkins, 261 B.R. at 823; In re Mathis Ins. Agency, Inc., the debtor must establish an appropriate reason to have a case dismissed. See, e.g., In re Schwartz, 178 B.R. 340 (Bankr. E.D.N.Y. 1995); In re MacDonald, 73 B.R. 254, 256 (Bankr. N.D. Ohio 1987); see also Mann v. American Federated Life Ins. Co., 215 B.R. 822 (S.D. Miss. 1997) (discussing section 1112(b)).

Whether an offered reason provides justification for dismissal is committed to court discretion, Matter of Atlas Supply Corp., 857 F.2d 1061, 1063 (5th Cir. 1988); In re Foster, 316 B.R. 718, 720 (Bankr. W.D. Mo. 2004); In re Heatley, 51 B.R. 518, 519 (Bankr. E.D. Pa. 1985), with the focus being to balance the respective interests of debtors, the trustee and creditors. See Matter of Atlas Supply Corp; In re McCullough, 229 B.R. 374, 376 (Bankr. E.D. Va. 1999); In re MacDonald; In re Heatley; see generally In re Misty Mountain, L.C., 270 B.R. 53, 57 (W.D. Va. 2001) (court should consider the impact of dismissal on the various "entities" in the bankruptcy case). To the extent that legitimate interests of the debtor would be harmed by remaining in bankruptcy, while the interests of creditors and the trustee would not suffer, or would suffer only insignificantly, then dismissal may be appropriate. In re Heatley. But to the extent that legitimate creditor interests would be harmed by dismissal, courts have uniformly denied the debtor's motion. See, e.g., Matter of Atlas Supply Corp., 857 F.2d at 1063 ("If dismissal would prejudice the creditors, then it will ordinarily be denied."); In re Stephenson, 262 B.R. 871, 874 (Bankr. W.D. Okla. 2001) ("[T]he predominant approach, at a minimum, requires that dismissal not cause prejudice to the creditors."); In re Harker, 181 B.R. 326, 328 (Bankr. E.D. Tenn. 1995) ("Generally, if creditors are prejudiced in any respect by

10

the dismissal . . ., a request by the debtor for dismissal will be denied."); In re MacDonald; In re Higbee, 58 B.R. 71 (Bankr. C.D. Ill. 1986); In re Mathis Ins. Agency, Inc.; In re Green, 49 B.R. 7 (Bankr. W.D. Ky. 1984); In re Martin, 30 B.R. 24 (Bankr. E.D.N.C. 1983); see also In re International Airport Inn Partnership, 517 F.2d 510, 512 (9th Cir. 1975) (construing the former Bankruptcy Act).[8]

> As one bankruptcy commentator has observed:
>
> When a debtor seeks dismissal, courts must take care to assure that creditors will not be prejudiced by dismissal. Debtors are not generally permitted to dismiss cases over the objections of creditors or the trustee in order to refile to gain a benefit of exemptions that had been improperly claimed in the first case. . . . Similarly, dismissal may be denied when it is sought because property has been obtained or is expected that could satisfy the debtor's debts . . . or because fraud on the part of the debtor is uncovered.

6 Collier on Bankruptcy, ¶ 707.03[3] at 707-23 to 707-24 (15th ed. rev. 2005) (footnotes omitted).

In this instance, the evidence is clear that the debtor's motivation in seeking dismissal is to prevent the trustee from attempting to sell her residence, after her amended

---

[8]Some courts have attempted to quantify this balancing of interests by detailing certain factors that may arise in any given case and should be considered. Those factors include:

> (1) whether all of the creditors have consented; (2) whether the debtor is acting in good faith; (3) whether dismissal would result in a prejudicial delay in payment; (4) whether dismissal would result in a reordering of priorities; (5) whether there is another proceeding through which the payment of claims can be handled; and (6) whether an objection to discharge, an objection to exemptions, or a preference claim is pending.

In re Turpen, 244 B.R. 431, 434 (B.A.P. 8th Cir. 2000).

Although the identification of factors may be helpful, such factors are never exclusive, and their application in any given case is subject to discretion and judgment.

11

exemption claim in that residence was denied. Although the debtor alleged in her motion to dismiss that she "has reached resolutions with her major creditors," Motion ¶ 2, the evidence presented was to the contrary. As of the date of the hearing, the debtor—or more accurately, her non-debtor spouse—had commenced some negotiations with PIDC, but those negotiations had not concluded. N.T., at 117. Nor had she even begun any discussions with NPB, the first mortgage holder, who has not been paid since the case commenced. N.T., at 45-46. There also was no evidence that the debtor had resolved her obligations to taxing authorities or any other creditors. N.T., at 173-74.

Furthermore, there was no evidence offered that the debtor had the ability to satisfy her obligations to creditors were this bankruptcy case dismissed. She simply offered conclusory statements that she could meet her obligations to creditors without explaining the source or amount of funding required. N.T., at 32. As the trustee noted in his testimony during the hearing:

> I have not seen a definitive plan from the debtor or the debtor's counsel as to what creditors are going to be paid, what the source of the funds will be, what's going to happen to other creditors that are schedule[d], and what is the timetable for making these payments.
>
> Without a definitive payment schedule and a source of funds, as far as I'm concerned, this is pie in the sky.
>
> * * *
>
> I have never received any written proposal from counsel for the debtor indicating here are the creditors we owe according to the schedules, and here is how we're going to make the payments, and here is the source of funds.

N.T., at 130-31. See In re Bartee, 317 B.R. at 366 ("We agree with the bankruptcy court that debtors' plan for liquidating assets was too speculative to establish the lack of

12

prejudice that is a prerequisite to [voluntary] dismissal [under section 707]."); In re Rodriguez, 57 B.R. 465, 466 (Bankr. S.D. Fla. 1985) (voluntary dismissal of a chapter 7 case is denied when the trustee has successfully challenged the debtors' exemption claims and the debtors "have provided no tangible assurance of their ability to pay all scheduled creditors[.]").

The debtor's dismissal request also ignores the efforts of the chapter 7 trustee, broker, appraiser and counsel, who have expended considerable time and expense in attempting to administer this case. See In re Wolfe, 12 B.R. 686, 687 (Bankr. S.D. Ohio 1981) (voluntary dismissal is granted only "upon the condition that debtor pay a fair sum for administrative costs[.]"); In re Jackson, 7 B.R. 616 (Bankr. E.D. Tenn. 1980) (same); In re Gallman, 6 B.R. 1 (Bankr. N.D. Ga. 1980) (same). While the debtor dismisses these efforts as unnecessary and wasteful, I note that the trustee's professionals have acted only after the trustee concluded—based first upon information obtained at the meeting of creditors in October 2004, and later from an appraiser report in February 2005—that the debtor's valuation of her residence was seriously understated, and after the debtor had claimed only the limited homestead exemption under section 522(d)(1).

Even if I were to accept as accurate the appraisal valuation offered by the debtor's expert, her scheduled valuation of her home was understated by about $300,000. If the trustee's expert appraisal is accurate, the debtor undervalued her realty by approximately $1 million. See In re Bartee, 317 B.R. at 366 ("In addition, there is an independent basis upon which to affirm the bankruptcy court's order denying dismissal of debtors' case. Debtors offered the bankruptcy court no explanation for the numerous

13

discrepancies in their bankruptcy schedules and statement of financial affairs alleged by the trustee.").

Implicitly, the debtor seeks to dismiss this case and leave the creditors to pursue their remedies in state court if they find future negotiations unfruitful, and for the trustee, his counsel, broker and appraiser to bear the expense of her inaccurate schedules and limited exemption claim. This result would be inequitable in these circumstances. See In re Jackson, 7 B.R. at 618. As the representative for NPB testified:

> [W]e're objecting to the dismissal of the bankruptcy because we think that we would be harmed. We felt the most expeditious way to get paid was through the trustee's plan to liquidate the property.
>
> When the debtor filed bankruptcy in August of 2004, I think on August 11th, is when the debtor filed, [at] the time the debtor was due for just August 4 of 2004, so basically current, just eleven days past due.
>
> So if the bankruptcy was dismissed we would be started [sic] the foreclosure process from ground zero at this point because we (indiscernible) of the bankruptcy .... It's a very lengthy process in Pennsylvania.

N.T., at 191-92.

I also find unpersuasive the debtor's argument that dismissal is appropriate because the trustee's continued administration of this case will yield no value for priority or unsecured creditors. That is, if the realty were worth only $850,000, then given the costs of sale, estimated to be 10% of the sale price, and the amount owed to lien creditors, $696,600; given that one-half the equity in the residence would be payable to the non-debtor spouse; and given the debtor's allowed homestead exemption of $18,450; little or no funds would be left to distribute to other creditors.

14

However, based upon my consideration of the conflicting testimony and appraisal reports offered, I cannot conclude that the debtor's evidence of value is more persuasive than that offered by the trustee. And the debtor has the ultimate burden of persuasion on this issue of dismissal. That is, the contention of the trustee's appraiser that the debtor's larger lot size and larger square footage adds considerably to market value, and that it is appropriate to compare the debtor's residence to recently sold properties within a one mile radius, is at least as persuasive as the debtor's appraiser's views to the contrary. Simply using the mid-point between the two appraisals results in a value of $1,175,000: sufficient to repay all lien and priority creditors and yield a measurable distribution to unsecured creditors.

Moreover, there are pending a trustee's complaint to sell Mr. Hill's interest in the realty under section 363(h) as well as a motion to sell the debtor's interest under section 363(b). In light of that pending litigation, I find there is no legitimate purpose in now dismissing this case because of widely differing expert estimates as to the value of the realty.

Appraisals are no more than expert predictions about the amount that an arms-length, commercially reasonable sales transaction would yield in the future. See Matter of Excello Press, Inc., 890 F.2d 896, 905 (7th Cir. 1989). In contrast, "[a] commercially reasonable sale of an asset [conclusively] establishes the market value of that asset." In re BTS Inc., 166 F.3d 346 (Table), 1998 WL 788829, at *1 (10th Cir. 1998). Appraisals should be relied upon, "only when the price of such a sale cannot be got at directly." Matter of Excello Press, Inc., 890 F.2d at 905.

15

If this case is not dismissed, I shall determine whether the trustee is entitled to sell the interest of Mr. St. Hill, as well as that of the debtor, in this jointly owned realty. If he can, then the trustee will need court approval to sell. If the offer obtained by the trustee does no more than repay liens on the realty, then the trustee's motion to sell may not be granted. See, e.g., In re K.C. Machine & Tool Co., 816 F.2d 238, 246 (6th Cir. 1987) (trustee should abandon property if the liens exceed the value of the collateral). But if the trustee's expert is correct, or only a purchase offer that equals the mid-point between the two appraisals is obtained, then there will be ample funds with which to repay all lien and priority creditors, plus make a significant distribution to general unsecured creditors.

The possibility, unanticipated by the debtor when she commenced this bankruptcy case, that the chapter 7 trustee would liquidate real estate is not cause to warrant dismissal of the case. See In re Schwartz, 178 B.R. 340, 343 (Bankr. E.D.N.Y. 1995); In re Mauk, 56 B.R. 445, 448 (Bankr. N.D. Ohio 1985):

> As for the Motion To Dismiss, a review of the record reflects that the Trustee has expended a significant amount of time and effort in the administration of this case. Furthermore, the Debtors have demonstrated no reason why their creditors should be required to resort to nonbankruptcy collection when such claims may be addressed within this bankruptcy proceeding. It appears that the filing of the Motion To Dismiss was motivated by the existence of equity in the property the Trustee intends to sell. If the case were dismissed, the Debtors would have the opportunity to dispose of that equity to the detriment of their creditors. In view of the fact that the Debtors have made no arrangement for the payment of their creditors outside of bankruptcy, there does not appear to be any reason this Court should not continue the proceedings which were voluntarily initiated by the Debtors.

16

In sum, given the opposition of NPB and the chapter 7 trustee to dismissal; given the extensive activities in this case during the almost 18 months it has been pending, including the trustee's successful challenge to the debtor's amended exemptions; given the debtor's serious underestimation of the value of her realty; given that the debtor offered no proposal for repaying her creditors outside of bankruptcy; given that she has not tendered a mortgage payment in more than one year, see, e.g., In re Turpen, 244 B.R. at 435 ("Creditors can incur prejudice if the motion to dismiss is brought after the passage of a considerable amount of time and they have been forestalled from collecting the amounts owed to them."); given that the mortgagee withdrew its request to foreclose in state court in deference to the trustee's efforts to sell the realty; and given the considerable expense incurred by the trustee and his professionals in administering this estate to date, expenses which the debtor has not offered to reimburse; the most equitable exercise of discretion under section 707(a) is to conclude that the debtor has not proven sufficient cause to dismiss her case.

Therefore, based upon the evidence presented, and with due regard to the appropriate balance of interests and the allocation of the burden of persuasion, the debtor's motion to dismiss shall be denied. In re Baumgarten, 154 B.R. 66, 69 (Bankr. S.D. Ohio 1993):

> The alleged ground for dismissal here is that the trustee may obtain an automobile as an estate asset as a result of his success in a preferential transfer action. The court does not believe that the debtors' failure or inability to predict the precise manner in which their assets would be liquidated for the benefit of their creditors constitutes sufficient cause for dismissal of the case.

17

See also In re Martin, 30 B.R. 24 (Bankr. E.D.N.C. 1983).  An appropriate order shall be entered.

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re                                           :    Chapter 7

JENNIFER ST. HILL                               :

      Debtor                          :    Bankruptcy No. 04-30919F

..................................................

ORDER

..................................................

AND NOW, this 26th day of January 2006, for the reasons stated in the accompanying memorandum, it is hereby ordered that the debtor's motion to voluntarily dismiss the chapter 7 bankruptcy case, pursuant to 11 U.S.C. § 707(a), is denied.

_____
BRUCE FOX
United States Bankruptcy Judge

copies to:

Ms. Jennifer St. Hill
217 West Indian Creek Road
Wynnewood, PA 19096

David A. Scholl, Esq.
Regional Bankruptcy Center of SE PA
Law Office of David A. Scholl
6 St Albans Avenue
Newtown Square, PA 19073

Marvin Krasny, Esq.
1650 Arch Street, 22nd Floor
Philadelphia, PA 19103

Amy Onder, Esq.
Wolf Block Schorr Solis-Cohen LLP
1650 Arch St. 22nd floor
Philadelphia, PA 19103-2097

Louis I. Lipsky, Esq.
Lipsky & Brandt
1101 Market Street, Suite 2820
Philadelphia, PA 19107

Karen H. Cook, Esq.
Golden Masano Bradley, Suite 201
1100 Berkshire Blvd.
Wyomissing, PA 19610

Mr. Daniel C. Polhill
5630 Carpenter Street
Philadelphia, PA 19143

Natalie D'Amora, Esq.
Bazelon less and Feldman
1515 Market Street, Suite 700
Philadelphia, PA 19102

Harry J. Giacometti, Esq.
Smith, Giacometti & Chikowski
100 South Broad Street, Suite 1200
Philadelphia, PA 19110